## KING INSTRUMENT CORPORATION, Plaintiff,

### v.

## Luciano PEREGO and Tapematic SrL, Defendants.

### Civ. A. No. 84–3227–H.

United States District Court, D. Massachusetts.

June 18, 1990.

---

Mark J. Pandiscio, Schiller, Pandiscio & Kusmer, Cambridge, Mass., David J. Brezner, Richard F. Trecartin, Flehr, Hohbach, Test, Albritton & Herbert, San Francisco, Cal., for plaintiff.

Katherine E. Perrelli, Charles Donelan, Day, Berry & Howard, Boston, Mass., Edgar H. Haug, Steven M. Amundson, Adam L. Brookman, Curtis, Morris & Safford, P.C., New York City, for defendants.

## OPINION

HARRINGTON, District Judge.

Plaintiff King Instrument Corporation ("King") brings this action alleging infringement of three King patents by the Defendants Luciano Perego ("Perego") and Tapematic SrL ("Tapematic").

Plaintiff King is a corporation organized under the laws of Massachusetts and having its principal place of business therein. Defendant Tapematic is a foreign corporation organized under the laws of Italy, with its principal place of business in Milan. Defendant Perego, a citizen of Italy, is the President and owner of Tapematic.

The business of all parties is the manufacture and sale of automated machines for loading magnetic audio or video tape into closed cassettes, from which activity the claims in this suit arise. King contends that Tapematic's distribution in the United States of its tape loading machines infringes upon three King patents:

1) PAT. NO.: 3,637,153 (the "153 Patent")
 TITLE: Machine Splicing and Winding Tape Into a Cassette
 ISSUED: January 25, 1972
2) PAT. NO.: 3,825,461 (the "461 Patent")
 TITLE: Splicing Head Assembly
 ISSUED: July 23, 1974
3) PAT. NO.: 3,997,123 (the "123 Patent")
 TITLE: Automatic Cassette Loading Machine
 ISSUED: December 14, 1976

Defendants' machines in issue are Models 900 and 900H/S (the "900 Series"), Model 2,002, and Models 3,001 and 3,002 (the "3,000 Series").[1] King further alleges that this infringement is willful and wanton.

---

1. Specifically, with regard to the '153 Patent, King asserts that all Tapematic machines infringe claims 2, 4, 5, 9, 10, 11, 12, 15 and 16. With regard to the '461 Patent, King asserts that

Defendants deny that they have infringed any of the patents in suit, and alternatively assert that the patents are invalid because of prior sale and misuse of the patents. This case was tried before the Court and without a jury.

## I. *Jurisdiction*

This Court has jurisdiction to resolve these disputed patent matters under Title 28, United States Code, Section 1338(a).

## II. *Background*

The method and apparatus claimed by plaintiff concern the loading of closed cassettes within which are mounted two winding hubs with magnetic tape spliced at each end to leader tape which is attached to each of the hubs. To accomplish that result, a sequence of cut-shift-splice-wind-cut-shift-splice is described in the claims. This sequential process involves a means of manipulating the magnetic and leader tapes in such a fashion as to accomplish the cut-shift-splice-wind-cut-shift-splice sequence. In order to manipulate the tape, the magnetic tape must be juxtaposed to the leader tape in such a manner as to permit the splicing of the two and the subsequent winding of the tapes so spliced for a predetermined length of tape and an ultimate further juxtaposition and splicing of magnetic tape to leader tape on the other hub.

The '153 Patent describes and claims a mechanical splicing block configuration which employs swinging arms to manipulate the magnetic tape in and out of juxtaposition with the leader tape. The '123 Patent describes and claims a winding machine which fully automates the machine embodied in the '153 Patent by adding a mechanism for storing a number of cassettes to be loaded and for advancing them one at a time to the loading position. The '123 Patent also embodies a mechanism

which extracts automatically the leader tape from the cassette and positions it on splicing blocks for splicing to the magnetic tape. The '461 Patent describes and claims a splicing head assembly for splicing tape by means of a diagonal shift block arrangement.

## III. *Validity*

It is a well established and codified rule that a United States patent is presumed valid, and one attacking the validity has the burden of proving invalidity by clear and convincing evidence. 35 U.S.C. § 282; *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1270, 225 U.S.P.Q. 345 (Fed.Cir. 1985); *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1573, 224 U.S.P.Q. 409 (Fed.Cir.1984).

 The validity of the '153 Patent has been previously challenged and affirmed by the Federal Circuit. *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 226 U.S.P.Q. 402 (Fed.Cir.1985), *cert. denied,* 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986). In *Otari,* the defendant challenged the validity of the '153 Patent under 35 U.S.C. §§ 102 and 103. After considering all the relevant prior art, the district court found that the invention claimed in the '153 Patent was not anticipated by the prior art, and also ruled that the differences between the prior art and the claimed subject matter as a whole would not have been obvious to one of ordinary skill in the tape winding art in 1969. The Federal Circuit Court affirmed. *See Otari,* 767 F.2d at 857. This Court declines to reopen the issue of validity of the '153 Patent on the ground of prior art where the Federal Circuit has acted and where additional evidence beyond that examined in *Otari* was *de minimus.*[2]

Tapematic Model 2,002 infringes claims 1, 2, 5, 6, 7, 11 and 12. Finally, with respect to the '123 Patent, King asserts that the 900 Series infringes claims 1, 2, 12, 22, 23, 26, 27, 30 and 35; that Model 2,002 infringes claims 1, 12, 15, 22, 23, 26, 27, 30 and 35; and that the Tapematic 3,000 Series infringes claims 1, 12, 15, 26, 27 and 35.

**2.** Tapematic also challenges the validity of the '153 Patent on the ground that the King invention was on sale in the United States more

than one year prior to the date of application for the patent in the United States. *See* 35 U.S.C. § 102(b). Defendants' evidence on this point falls far below the clear and convincing standard, and testimony to the contrary by King was supported by the evidence. This Court finds that there was no offer for sale prior to February 9, 1969 of a functional tape loading machine embodied in the '153 patent.

## IV. *Infringement*

The plaintiff has the burden of proof to establish by a preponderance of the evidence that the accused machines have infringed various claims of the '153 Patent, the '461 Patent and the '123 Patent.

### A. *Literal*

The test for literal infringement has two aspects. First, the language of the claim in issue must be interpreted by the court as a matter of law. Second, the trier of fact must determine whether the language describes, or "reads on," an accused product. *See Standard Oil Co. v. American Cyanamid Co.* 774 F.2d 448, 452, 227 U.S.P.Q. 293 (Fed.Cir.1985). The accused product is not compared with an embodiment of the patent, but rather with the language of the claims. *See Martin v. Barber*, 755 F.2d 1564, 1567, 225 U.S.P.Q. 233 (Fed.Cir.1985).

Several of the independent claims in all of the patents utilize "means plus function" language. To interpret such functional claims, one must turn to paragraph 6 of 35 U.S.C. § 112:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

Under Section 112, paragraph 6, the patentee is entitled to protection covering *equivalents* as well as the specified "structure, material or acts." *Palumbo v. Don–Joy Co.*, 762 F.2d 969, 226 U.S.P.Q. 5 (Fed.Cir.1985). With respect to the part of a claim to which Section 112, paragraph 6, pertains, it "does not, in any event, *expand* the scope of the claim." *Johnston v. Ivac Corp.*, 885 F.2d 1574, 1580, 12 U.S.P.Q.2d 1382 (Fed.Cir.1989) (emphasis in original). An element of a claim described as a means for performing a function, if read literally, would encompass *any* means for performing the function. Section 112, paragraph 6, operates to cut back on the types of means

which could literally satisfy the claim language. *Id.*

For a means plus function limitation to "read on" an accused device, the accused device must incorporate the means for performing the function disclosed in the specification or a structural equivalent of that means, plus it must perform the identical function. "If the required function is not performed *exactly* in the accused device, it must be borne in mind that Section 112, paragraph 6, equivalency is not involved. Section 112, paragraph 6, plays no role in determining whether an equivalent function is performed by the accused device under the doctrine of equivalents." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934, 4 U.S.P.Q.2d 1737 (Fed.Cir. 1987), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988). "Section 112, paragraph 6, can never provide a basis for finding that a means-plus-function claim element is met literally where the function part of the element is not literally met in an accused device." *Johnston v. IVAC Corp.*, 885 F.2d 1574 (Fed.Cir.1989).

"To determine whether a claim limitation is met literally, where expressed as a means for performing a stated function, the court must compare the accused structure with the disclosed structure, and must find equivalent structure as well as identity of claimed function for that structure." *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d at 934 (Fed.Cir.1987) (emphasis in original), *citing Palumbo v. Don–Joy Co.*, 762 F.2d 969, 975 (Fed.Cir.1985); *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575, 225 U.S.P.Q. 236 (Fed.Cir.1985), *appeal aff'd*, 802 F.2d 421, 231 U.S.P.Q. 276 (Fed.Cir.1986); *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 731 F.2d 840, 848 (Fed.Cir.1984), *cert. denied*, 469 U.S. 831, 105 S.Ct. 119, 83 L.Ed.2d 62 (1984).

■ Whether an accused device is an equivalent of that claimed in a means plus function claim is a question of fact. The Federal Circuit has recently approved the use of a three-part test for determining means plus function equivalents that has long been applied to analyses under the

doctrine of equivalents:[3] Does the asserted equivalent perform substantially the same function in substantially the same way to accomplish substantially the same result? *Texas Instruments v. U.S. Intern. Trade Com'n*, 805 F.2d 1558, 1571, 231 U.S.P.Q. 833 (Fed.Cir.1986), *re'hng denied,* 846 F.2d 1369 (1988); *see also Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), *re'hng denied*, 340 U.S. 845, 71 S.Ct. 12, 95 L.Ed. 620 (1950); *Palumbo v. Don–Joy Co.*, 762 F.2d at 975 n. 4 (1985). In construing a "means plus function" claim, as also in construing other types of claims, a number of factors may be considered, including the language of the claim, the patent specification, the prosecution history of the patent, other claims in the patent, and expert testimony. *Texas Instruments*, 805 F.2d at 1568; *Palumbo v. Don–Joy Co.*, 762 F.2d at 975 (Fed.Cir. 1985).

*'153 Patent*

Plaintiff alleges that all of defendants' machines in suit infringe the '153 Patent claims 2, 4, 5, 9, 10, 11, 12, 15 and 16. Specifically, plaintiff asserts that defendants' shift block mechanism designed to align the leader and magnetic tape for cutting, splicing and winding infringes the swing arm mechanism claimed in the '153 Patent.

All of defendants' machines use substantially the same shift block arrangement which may collectively be referred to as defendants' horizontal shift block assembly.[4] This assembly consists of two splicing blocks. The first block is fixed and contains one tape-support groove. The second block is the shifting block and contains two tape-support grooves. The leader tape lies across both blocks whereupon it is cut into two sections by a knife unit. The blocks have a series of holes through which vacuum is applied to hold the tape in place during the operation. A means is provided for shifting one block relative to the other so as to selectively align the second groove of the second block which supports the magnetic tape with the single groove of the first block which supports one end of the leader tape. A splicing tape dispenser splices the leader tape and magnetic tape. The tape is wound into the cassette and then cut at a predetermined length. The block then shifts back to its original position, aligning and splicing the wound tape with the leader tape end located in the first groove of the second block.

In order to infringe a claim, the accused device must practice all of the elements described in the claim. Claims 2, 10 and 16 are the independent claims of the '153 Patent which plaintiff alleges defendants have infringed. The first independent claim at issue in the '153 Patent is claim 2 which comprises a series of means plus function clauses and therefore is governed by 35 U.S.C. § 112, paragraph 6.[5] By way of illustration, claim 2 of the '153 Patent is set forth below:

2. Apparatus for severing a leader tape that is attached at its opposite ends to two hubs into two leaders and for splicing said leaders to the opposite ends of a length of use tape obtained from a supply roll of said use tape, said apparatus comprising a splicing station comprising a first stationary tape support member

---

3. A product that does not literally infringe may nevertheless infringe under the doctrine of equivalents. For a discussion of this doctrine, see part B, *supra*.

4. The shift block assembly on the Model 2,002 operates on a horizontal plane in relation to the vertical standing machine. The 900 Series are tabletop (horizontal) machines and the shift block assemblies operate on a vertical plane in relation to the horizontal nature of the machine. The difference in planes of the shift block assemblies may be attributed to the structure of the machine, and not the operation of the shift

blocks, which for all relevant purposes is identical.

The shift block assembly on the 3,000 Series is very similar to that contained on the 2,002 machine, but it has an additional movement in that the entire shift block assembly rotates on an axis 45 degrees in order to reach the plane of the splicer. (Perego, Day 8, p. 80).

5. Claims 10 and 16 are also means plus function claims and as such the foregoing Section 112, paragraph 6 analysis is equally applicable to those claims.

and second and third moveable tape support members;

means for alternately shifting said second and third support members into and out of adjacent relation to said first tape support member, said first and second support members when adjacent to each other constituting a first splicing head and said first and third support members when adjacent to each other constituting a second splicing head;

a knife operable to slit tape supported on said first and second splicing heads;

means for holding said supply roll of use tape, selectively operable first and second tape-holding means for holding said leader tape on said first and second tape support members respectively;

selectively operable third tape-holding means for holding the leading end of said use tape on said third tape support member;

selectively operable splicing tape applicator means for applying a splicing tape to the adjacent ends of leader and use tapes supported by said first and second splicing heads;

selectively operable tape-winding means comprising a rotatable spindle adapted to hold and rotate one of said hubs and means for rotatably driving said spindle; and

control means for sequentially operating the foregoing means so as to effect the following operation: operating said first, second and third tape-holding means so as to hold said leader tape on said first and second support members and the leading end of said use tape on said third support member, operating said knife to slit said leader tape into a first leader held to said first tape support member and a second leader held to said first tape support member, shifting said second and third tape support members to form said second splicing head, operating said splicing tape applicator means to splice said first leader to the end of the use tape held to said third tape support member, releasing said first and third tape-holding means and rotatably driving said spindle to wind said spliced to said first leader on said one hub, reoperating said first and third tape-holding means to hold said use tape to said second splicing head, operating said knife to slit the use tape on said second splicing head, shifting said second and third tape support members to form said first splicing head, reoperating said splicing tape applicator means to splice second leader to the trailing end of the use tape held on said first tape support member, and releasing said first and second tape holding means.

### Findings of Fact and Conclusions of Law

 I find under 35 U.S.C. § 112, paragraph 6, that the horizontal shift block assembly contained in all of the defendants' machines is not the "equivalent" of the pivoting swing arm assembly claimed by the '153 Patent in independent claims 2, 10 and 16.[6] Although the shift block assembly and the swing arm assembly have substantially the same function and achieve substantially the same result, the way in which they achieve this result is radically different. In comparing the accused structure with that disclosed in the specifications of the '153 Patent, the factfinder is immediately confronted with two different methods to align and splice tape. The specifications of the '153 Patent disclose a pivoting swing arm assembly which uses a reversing four-bar link mechanism with a

---

**6.** Plaintiff points to the decision of a District Court for the Northern District of California in which Judge Ingram held that Otari Corporation's tape loading machine, which employed a shift block assembly, infringed the '153 Patent at issue in that suit. The Federal Circuit affirmed the finding of infringement, *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853 (Fed.Cir. 1985), but noted that, with regard to the Section 112, ¶ 6, analysis of record, there was no examination of the patent specifications, of the prosecution history or of other claims in the patent.

The Federal Circuit noted that any equivalence analysis at the District Court level was slight, as the district court did not even have before it a picture of the accused device. *See Otari*, 767 F.2d at 856 n. 1, 863 and n. 7. The only evidence of record with regard to equivalence was the expert testimony of Mr. Zimmerman, who also testified for the plaintiff in this case. Because Mr. Zimmerman's testimony was not persuasive to this Court, the *Otari* decision will not prevent a finding here of nonequivalence.

pivoting motion operating on a single plane. The Tapematic machines, by contrast, are sliding shift block assemblies, using a single link mechanism and operating on two planes. The specifications of the '153 Patent disclose the use of three separate splicing blocks, one which is fixed and two pivoting blocks which rotate in opposite directions. The accused shift block arrangement uses only two blocks to complete the splicing operation, one which is fixed and the other which alternately shifts into alignment the leader tape and the magnetic tape. Ernesto E. Blanco, a professor of mechanical engineering at MIT and an expert witness retained on behalf of defendants, testified that from the standpoint of a mechanical engineer the two systems were "totally and radically different." (Ernesto Blanco, Trial day 23, p. 45). Plaintiff's expert witness, Warren Isom, testified that while the swing arm assembly of the '153 Patent and the horizontal shift block assemblies have the same function, the horizontal shift block machines execute the function differently. (Warren Isom, Trial day 25, p. 6). Even James King, the inventor of the '153 Patent, admitted that the shift block assembly and the swing arm assembly performed the same function in two different ways. (James King, Trial day 4, p. 81). Finally, evidence revealed that the swing arm assembly was not an effective mechanism for aligning and splicing tape, and that even before the '153 Patent was issued, King Instrument was experimenting with another shift block assembly similar to that employed by the defendants, which ultimately replaced the swing arm assembly on the King machines.

All of the independent claims of the '153 Patent which are alleged to be infringed fail because the accused devices do not perform an element in each claim, namely, the element relating to the means for aligning and splicing tape, in substantially the same way as that disclosed in the patent.[7] As the dependent claims of a patent survive only if the independent claims are infringed, all dependent claims fail too, and this Court finds no literal infringement of the '153 Patent by the defendants under Section 112, paragraph 6.

'461 Patent

Plaintiff alleges that the Tapematic Model 2,002 infringes the '461 Patent claims 1, 2, 5, 6, 7, 11 and 12. Specifically, plaintiff asserts that the splicing assembly used to splice magnetic tape at the end of one reel to magnetic tape at the beginning of another reel infringes the splicing head assembly claimed in the '461 Patent.

Defendants' Model 2,002 is a fully automated machine which has many advanced features, including the ability to switch automatically from an empty reel of magnetic tape to a full reel of magnetic tape without stopping the machine. This feature has a profound effect on the speed and efficiency of the machine as there is no down time when a full reel of magnetic tape must be loaded. Model 2,002 has two separate splicing assemblies. The assembly used to splice magnetic tape to leader tape for the loading of each cassette is the horizontal shift block arrangement previously described in the discussion regarding the '153 Patent.

The splicing assembly used to splice the magnetic tape between the two magnetic tape reels employs one fixed block and two movable blocks and carries out the same cut-shift-splice-wind-cut-shift-splice operation as do the horizontal shift blocks. In this assembly the two movable blocks, which alternately align the end of the first

---

7. Claim 16 of the '153 Patent does not literally specify any means for aligning tape for splicing. Although it is true that a claim need not include all elements necessary to make up a complete operative device, each claim must cover a patentable invention. See Pursche v. Atlas Scraper and Engineering Co., 300 F.2d 467, 476 (1962). A claim must include elements that are essential to the definition of the particular invention that the claim is drawn to cover. Id. See also Hughes Aircraft Co. v. United States, 226 Ct.Cl. 1, 640 F.2d 1193, 1197–98 (1980). Claim 16 describes an apparatus for loading magnetic tape into a cassette, the essential part of which is a means by which to selectively align the magnetic tape and leader tape for the splicing and winding operation. The swing arm assembly described in the specifications is an essential element to the apparatus described in claim 16.

reel of magnetic tape to the beginning of the second reel of magnetic tape, move up and down in a transverse, or diagonal, motion and on a common plane. Plaintiff alleges that it is this splicing assembly which infringes the splicing head assembly claimed in the '461 Patent.

■ When interpreting the scope of a claim, one must first examine the language of that claim. Claims 1 and 12 are the two independent claims of the '461 Patent. Claim 1 reads as follows:

1. A splicing head assembly for use in splicing a recording tape to leader tapes comprising:

a first tape support member having a tape-supporting surface and means cooperating with said tape-supporting surface to define a guideway for tape supported on said surface;

second and third tape support members each having a tape-supporting surface and means cooperating with said tape-supporting surface to define a guideway for a tape supported on said surface, said second and third tape support means being fixed relative to one another so that their tape-supporting surfaces and the tape-supporting surface of said first member extend substantially parallel to one another and so that their guideways and the guideway of said first tape support members reside in a common plane; means for releasably holding a tape in position along each guideway; and means for providing relative reciprocal movement between said first member on the one hand and said second and third members on the other hand along an axis extending transversely of said tape-supporting surfaces of said second and third members.

Claim 1 contains four separate elements and a preamble. Traditionally, a preamble of a claim may constitute a statement of purpose for the device, or it may give additional structural limitations to a claim. If the words of the preamble "give life and meaning" to the claim, then it may be interpreted to limit further the scope of the claim. *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1257, 9 P.Q.2d 1962 (Fed.Cir.1989); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866, 228 U.S.P.Q. 90 (Fed.Cir.1985). Here, the '461 specifications indicate that the inventor was working on the particular problem of creating an effective splicing assembly to manipulate video magnetic tape and leader tape. To read the claim without regard to the preamble would greatly expand the scope of the claim beyond its plain meaning. I therefore conclude that the claim preamble in this instance states more than a purpose or intended use for the claimed structure and in fact gives meaning to the claim and properly defines the invention. *See Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 896, 221 U.S.P.Q. 669 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984).

■ With that clarification, it is clear that defendants' Model 2,002 does not infringe claim 1 of the '461 patent. Although both assemblies have as their function the splicing of tape, claim 1 is limited to a structure used to splice magnetic tape to leader tape. Defendants' assembly is used to splice magnetic tape to magnetic tape. Therefore, there is no literal infringement of claim 1 of the '461 patent.

■ Claim 12, the other independent claim in the '461 Patent, is a much broader claim.[8] It has no preamble restricting the

8. Claim 12 of the '461 Patent reads as follows:

12. A splicing head assembly comprising first, second and third splicing blocks, a support for said splicing blocks, means securing said first block to said support, an actuator mounted to said support having a reciprocal operating member and adapted to move said operating member from one to the other of first and second positions, means attached to said support mounting said second and third blocks for movement in a vertical plane, means connecting said operating member to said second and third blocks so that said second and third blocks move with said operating member, said first block having first tape guide means for positioning a first tape on said first block, and said second and third blocks having second and third tape guide means for positioning second and third tapes on said second and third blocks respectively so that one of said second and third tapes is aligned with the tape positioned on said first

claim to the splicing of magnetic tape to leader tape. Defendants' splicing assembly "reads on" all of the elements of claim 12 and therefore literally infringes the '461 Patent.

Defendants argue that the '461 Patent only covers splicing assemblies which have as their function splicing video magnetic tape to video leader tape. Defendants argue correctly that the claims must be interpreted in light of the specifications and point out that a specific object of the invention protected by the '461 Patent, as set forth in the specifications, is to "provide a splicing head assembly for machines for splicing and winding magnetic recording tape, the splicing head assembly being compact, fast-acting and particularly adapted for handling video tape." Plaintiff's Exh. 47; col. 1, lines 34–38. Furthermore, the specifications point out that this invention was intended to replace other splicing assemblies used in video loading machines that could not accommodate the extent of lateral movement involved in shifting the movable splicing block to align video tape. Because defendants' assembly operates to splice audio magnetic tape to audio magnetic tape, and because it is not used in the cut-shift-splice-wind-cut-shift splice manipulation, they argue that the function and result are substantially different and therefore there is no infringement of the '461 Patent.

The specifications do not so limit the protection granted by the '461 Patent to the splicing of video magnetic tape to video leader tape. The patent is entitled "Splicing Head Assembly." Its primary object as set forth in the first column is "to provide a new and improved apparatus for splicing tape." Plaintiff's Exh. 47; col. 1, lines 29–30. Although the specifications reveal that the motivation behind developing this invention may have been problems associated with splicing video magnetic tape and leader tape, the grant is nowhere limited by the type of tape to be spliced.

Finally, defendants argue that by reference to limitations in other claims of the '461 Patent, it is obvious that the entire patent is limited in scope to splicing assemblies for splicing video magnetic tape to video leader tape. Although reference to other claims may be proper when interpreting a claim in dispute, limitations of other claims may not be read onto a broader claim in order to escape infringement. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d at 1574 (1985), *and cases cited.* Claim 12 is a much broader claim than claim 1 and shall not be narrowed in scope by limitations found in other claims.

*'123 Patent*

King's third patent in suit is the '123 Patent. There are four independent claims at issue. King alleges that defendants' Tapematic 900 Series and Model 2,002 infringe independent claims 1, 12, 30 and 35. King also alleges that defendants' 3,000 Series infringe claims 1, 12 and 35. Plaintiff does not allege literal infringement of claims 30 or 35 but relies on the doctrine of equivalents for a finding of infringement. First, this Court will consider whether any of defendants' machines literally infringe claims 1 and 12 of the '123 Patent.

The invention claimed in the '123 Patent automated the machine claimed in the '153 Patent in substantially two ways. First, the '123 Patent includes a means by which to withdraw the leader tape from a cassette and to position it on the splicing assembly. The '153 Patent claimed no such device, and that operation was previously done manually. Second, the '123 Patent includes a means by which to store a number of cassettes which automatically advances them one at a time into the loading position. This operation was also previously done manually.

Plaintiff argues that under Section 112, paragraph 6 analysis defendants' leader extractors and positioners in each of their machines are the equivalent of the leader extractor and positioner mechanism

block when said operating member is in one of said first and second positions and the other of said second and third tapes is aligned

with the tape positioned on said first block when said operating member is shifted to the other of said first and second positions.

claimed in the '123 Patent. A brief description of the accused mechanisms in each of the defendants' machines is in order.

The Tapematic 900 Series machine operates on a horizontal plane. There are a series of steps involved to extract the leader tape from the cassette and position it on the splicing blocks. First, when the cassette is in its loading position, an aspirator advances towards the open end of the cassette and vacuums out a small loop of leader tape. Next, a pin attached to an arm is positioned inside the loop. The arm then pulls the leader tape in an arc motion across the machine and places the leader onto the vacuum head of the splicing blocks. At this stage the cassette is ready for the splicing operation.

The Tapematic 2,002 machine operates on a vertical plane, and here too the manipulation of the leader from the cassette to the splicing assembly involves several steps. When the cassette is in the loading position, an aspirator advances out of the machine and is positioned under the open end of the cassette. The aspirator then extracts by vacuum a small loop of leader tape. Next, a pin attached to a carriage is inserted into the loop and the aspirator retreats back into the wall of the machine. The carriage then causes the pin to pull the tape across the machine. The whole carriage mechanism shifts downward to position the leader tape over the splicing blocks. Vacuum is applied to hold the leader tape against the blocks. The carriage then shifts back upward, moving the top side of the leader tape out of the way of the cut-shift-splice operation.

The Tapematic 3,000 Series machines, which load video magnetic tape into V-0 cassettes, extract and position the leader tape by another method specifically adapted to the video cassette, which has a very short leader tape. The cassette has a protective lid that is flipped open when in the loading position, exposing two hubs. In this operation, there are two pins which are linked to two pivoting arms. The pins penetrate the cassette under the leader tape and lift the leader tape out of the cassette and up to the splicing blocks, which are

upside down. No air or vacuum is used during this process and the splicing operation takes place directly above the cassette.

The moveable leader extractor mechanism for withdrawing the leader from a cassette located at the loading position and for positioning the leader on the splicing blocks contained in the clauses of independent claims 1 and 12 of the '123 Patent withdraws the leader tape from the cassette by means of a moving vacuum chamber and precisely positions the leader on the splicing block assembly. The language of claims 1 and 12 which describe the leader extracting and positioning feature is as follows:

Claim 1:

reciprocally movable leader extractor means for withdrawing the leader from a cassette located at said loading position and positioning said leader on said splicing block means, said leader extractor means comprising a leader extractor member which is movable relative to said splicing block means toward and away from said loading position;

Claim 12:

reciprocally movable leader extractor means for withdrawing the leader from a cassette located at said loading position and positioning said leader on said splicing block means....

■ I find, as a matter of fact, that the leader extracting and positioning mechanisms in the Tapematic machines operate in a substantially different way than that claimed in the '123 Patent. The specifications of the '123 Patent disclose a single mechanism for performing the extracting and positioning of the leader tape. This mechanism is a vacuum chamber attached to a carriage which, in one movement, vacuums the leader tape out of the cassette and holds the tape while the carriage pulls the vacuum chamber across to the loading position. While claims 1 and 12 describe the extracting and positioning of the leader tape in the '123 Patent by one mechanism in a single movement, all of the Tapematic machines have at least two different components performing these tasks, and they do so in a substantially different way. I

find, therefore, that there is no literal infringement of the '123 Patent under Section 112, paragraph 6.

## B. *Doctrine of Equivalents*

Where a claim does not literally "read on" an accused device because one or more limitations are not met exactly, infringement may be found if such limitations are satisfied equivalently. The accused device may then be said to perform substantially the same overall work to achieve substantially the same overall result by substantially the same means. *Johnston v. Ivac Corp.*, 885 F.2d at 1581. The doctrine of equivalents is not intended to extend or enlarge the scope of patent protection as defined by the claims. "[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the [patent office] by literal claims." *Wilson Sporting Goods, Co. v. David Geoffrey & Associates, et al.*, 904 F.2d 677 (Fed.Cir. 1990). Rather, "application of the doctrine *expands the right to exclude* to 'equivalents' of what is claimed." *Id.* (Emphasis in original).

In the case of infringement under the doctrine of equivalents, the accused structure is compared with the claimed invention as a whole. *Texas Instruments v. U.S. Intern. Trade Com'n*, 805 F.2d 1558, 1571 (Fed.Cir.1986). This analysis does not mean that one can ignore claim limitations. Every element of the claim must still be present in order to find infringement under the doctrine of equivalents. The doctrine was not intended to forego the requirement that every element embodied in a claim (or its equivalent) must be present in the accused device in order to find infringement. ... [I]n applying the doctrine of equivalents, each limitation must be viewed in the context of the entire claim.... "It is ... well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device." *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir.1985). To be a "substantial equiva-

lent," the element substituted in the accused device for the element set forth in the claim must not be such as would substantially change the way in which the function of the claimed invention is performed.

*Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d at 935 (1987), *quoting Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–33 (Fed.Cir. 1987).

Thus, under the doctrine of equivalents analysis, "if a claim limitation or its substantial equivalent is not present, there can be no infringement." *Julien v. Zeringue*, 864 F.2d 1569, 1571, 9 U.S.P.Q.2d 1552 (Fed.Cir.1989). *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1259 (Fed.Cir.1989); *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35, 4 U.S.P.Q. 1737 (Fed.Cir.1987) (en banc), *cert. denied*, 485 U.S. 961, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988), *and cert. denied*, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988); *Lemelson v. United States*, 752 F.2d at 1551 (1985). The Federal Circuit in *Zeringue* dismissed as without merit the argument that the district court could ignore claim limitations and merely compare the claimed invention's overall operation and ideology with that of the accused. *Zeringue*, 864 F.2d at 1570.

■ Such an analysis, however, does not require equivalency in *components*. "One-to-one correspondence of components is not required, and elements or steps may be combined without *ipso facto* loss of equivalency. Each case must be decided in light of the nature and extent of the differences between the accused device and the claimed invention, on the equitable principles of the doctrine of equivalents." *Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 989, 10 U.S.P.Q.2d 1338 (Fed.Cir.1989), *re'hng denied*, 892 F.2d 73 (1989) (citations omitted). Under the doctrine of equivalents, while "an equivalent must be found for every limitation of the claim somewhere in the accused device," there need not be a corresponding compo-

nent, "although that is generally the case." *Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,* 868 F.2d 1251 (Fed.Cir.1989).[9]

In determining equivalents, consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was. *Graver Tank & Mfg. Co. v. Linde Air Products,* 70 S.Ct. at 857 (1950). The question this Court must consider under the doctrine of equivalents is the same three-part test used for determining literal infringement under Section 112, paragraph 6: does the asserted equivalent perform substantially the same function in substantially the same way to accomplish substantially the same result? *Texas Instruments v. U.S. Intern. Trade Com'n,* 805 F.2d 1558 (Fed.Cir.1986).

*'153 Patent*

■ The analysis performed under Section 112, paragraph 6, is useful in our determination under the doctrine of equivalents. Even when comparing the accused structure with the claimed invention as a whole, this Court is convinced that the horizontal shift block assembly contained in all of the defendants' machines operates in a substantially different way than the pivoting swing arm assembly claimed by the '153 Patent in independent claims 2, 10 and 16. As a result, there is no infringement of the '153 Patent under the doctrine of equivalents.

9. Plaintiff relies on *Sun Studs* for the proposition that it is legal error for the court to apply to the doctrine of equivalents the more limited scope of the literal infringement provisions of 35 U.S.C. § 112, ¶ 6, in that under the doctrine of equivalents, each step or element must be viewed in the context of the entire claim. *See Sun Studs,* 872 F.2d at 989. Martin O'Donnell, Trial day 27, p. 22. *Sun Studs,* however, does not change the legal rule that if a limitation is missing, there can be no infringement under either Section 112, paragraph 6, or doctrine of equivalents analyses. *Sun Studs* merely says that there may still be infringement under the

*'123 Patent*

■ Claims 1 and 12 of the '123 Patent are also not infringed under the doctrine of equivalents. The leader extractor and positioner described in claims 1 and 12 does not find its substantial equivalent in any Tapematic machine. The differences in operation are insurmountable to a finding of infringement under the doctrine of equivalents. My analysis of these claims under Section 112, paragraph 6, equally supports my finding here.

Two pertinent elements in claim 30 of the '123 Patent are a "means for connecting said leader extractor member to a source of vacuum," and "means for reciprocally moving said leader extractor member so that the leader is withdrawn from said cassette by suction and positioned on said splicing block assembly as said leader extractor member is reciprocated toward and away from said cassette." Similarly, claim 35 describes a method for "withdrawing the leader from the cassette by a movable suction device and moving the suction device with the leader so as to position the withdrawn leader upon a splicing block assembly...." The use of vacuum is a distinguishing feature in the way in which these functions are accomplished and the mechanical devices used by the 900 Series, Model 2,002 and the 3,000 Series are not its substantial equivalent. An object of the invention, as set forth in the specifications, is to provide an automated machine "wherein the leader is extracted from the blank cassettes by a leader extractor *which utilizes only suction to withdraw the leader from the cassette* and which is adapted to precisely and rapidly position the leader on the splicing block assembly."

doctrine of equivalents if a limitation performed by a single means in a claim is performed in the substantially same way in the accused device but by more than one means. *Compare* 35 U.S.C. § 112, paragraph 6 (where "the sole question is whether the *single means* in the accused device which performs the function stated in the claim is the same as or an equivalent of the corresponding structure described in the patentee's specification as performing that function.") *D.M.I. v. Deere,* 755 F.2d 1570, 1575 (Fed.Cir.1985). *See generally Stun Studs, Inc. v. ATA Equipment Leasing, Inc.,* 872 F.2d 978 (Fed. Cir.1989).

Plaintiff's Exh. 45; col. 2, lines 11–17. (Emphasis added). For this reason, as well as those set forth in my analysis under literal infringement, pursuant to Section 112, paragraph 6, I find that the extracting and positioning mechanisms of the Tapematic machines do not operate in substantially the same way as the means claimed in the '123 Patent.

Plaintiff argues that because the function and result of the mechanisms are the same, the way in which it achieves this result should be examined in light of the similarities of these other criteria. But prevailing patent law is otherwise:

> Perkin–Elmer's repeated assertions that the claimed and accused devices perform substantially the same function and achieve substantially the same end result are not helpful. That circumstance is commonplace when the devices are sold in competition. That a claimed invention and an accused device may perform substantially the same function and may achieve the same result will not make the latter an infringement under the doctrine of equivalents where it performs the function and achieves the result in a substantially different way. *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097, 85 U.S.P.Q. 328, 330 (1950); *see, e.g., Sealed Air Corp. v. U.S. International Trade Com.*, 645 F.2d 976, 984, 209 U.S.P.Q. 469, 476 (CCPA 1981).

*Perkin–Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1531 n. 6, 3 U.S.P.Q.2d 1321, 1323–24 n. 6 (Fed.Cir. 1987). *Accord Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1258 (Fed.Cir.1989).

Defendants' machines have another important component which is substantially different than its counterpart described in the '123 Patent. The mechanism for storing a plurality of cassettes to be loaded and for advancing them one at a time to the loading station contained in clauses in independent claims 1, 12 and 35 of the '123 Patent consists of an elephant trunk type magazine which requires all of the cassettes to be placed in the magazine with the opening for the leader tape facing in the same forward direction. Defendants' 900 Series and Model 2,002 machines consist of a vertical magazine allowing the cassettes to be placed in the magazine with the opening for the leader tape facing in either of two directions, but necessitating an orientation device to position the cassette in the proper position prior to forwarding the cassette to the loading station. Defendants' 3,000 Series has a vertical magazine which releases tapes by way of a pivoting door which allows each tape to fall along a guide in an arch motion. Two C-shaped supports then pick up the cassette and carry it to the loading position.

With regard to the magazine cassette feeding system, the claims of the '123 Patent are limited in scope by U.S. Patent No. 3,814,343 issued to W.P. Bennett (the "Bennett Patent"). The specifications of the '123 Patent describe its magazine assembly as an improvement over that disclosed in the Bennett Patent, which requires the orientation device.

> [The Bennett machine] utilizes a cassette receiver, which is movable bidirectionally in two different modes, for receiving cassettes one at a time from a cassette storage magazine and positioning the received cassette in a selected tape loading position. Such a receiver is costly, space consuming, and requires a complicated drive means for causing the receiver to move in either of two directions in each of its two possible modes of movement. Plaintiff's Exh. 45; col. 2, lines 42–51.

A specific object of the '123 Patent, as set forth in its specifications, is to overcome and avoid the limitations of the machine described in the Bennett Patent. By avoiding the need for an orientation device, the '123 Patent was intended to have a more efficient, less costly way in which to store and advance cassettes. But distinguishing itself from magazine assemblies which require an orientation device, the '123 Patent became limited to protection against tape loaders which avoid the very magazine assembly Tapematic employs.

I find that the magazine assemblies of the Tapematic machines operate in a substantially different way than that described in claims 1, 12 and 35 of the '123 Patent. The Tapematic 900 Series and Model 2,002 magazine assemblies do not avoid the orientation device and in fact depend upon it for its speed and efficiency in advancing cassettes. The same language that provides legitimacy to the '123 Patent claims precludes a finding of infringement here, under either the doctrine of equivalents or Section 112, paragraph 6. *See generally Wilson Sporting Goods, supra.*

As for the 3,000 Series, although the magazine feeding assembly does not have an orientation device, this Court finds that its total operation is so substantially different from that claimed in the '123 Patent, that it belies reality to suggest it could be an equivalent. In sum, I find that none of the Tapematic machines at issue infringe the '123 patent, either literally, or under the doctrine of equivalents.

### V. *Other Matters*

Plaintiff has also alleged that Defendant Perego willfully infringed plaintiff's patents. Willful infringement is a question of fact which must be proven by clear and convincing evidence in order to increase damages. *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.,* 758 F.2d 613, 628, 225 U.S.P.Q. 634 (Fed.Cir.), *cert. dismissed,* 474 U.S. 976, 106 S.Ct. 340, 88 L.Ed.2d 326 (1985); *Windsurfing International, Inc. v. Fred Ostermann GmbH,* 668 F.Supp. 812, 813, 4 U.S.P.Q.2d 1429 (S.D.N.Y.1987). Plaintiff has failed to present any evidence which could lead a factfinder to find willful infringement. Similarly lacking is any credible evidence that plaintiff is guilty of patent misuse.

### VI. *Damages*

Any infringement tends to dampen the fires of creativity so necessary to the vitality of society, economic and otherwise. The law is the protector of the inventor's del-icate genius and nourishes its growth and development.

■ To receive lost profits as a measure of damages, the patent owner must show that there was a reasonable probability that, but for the infringement, it would have made the infringer's sales. *State Industries, Inc. v. Mor–Flo Industries, Inc.,* 883 F.2d 1573, 1577, 12 U.S.P.Q.2d 1026 (Fed.Cir.1989), *re'hng denied,* 1989 WL 99825, 1989 U.S. App. LEXIS 16,954 (1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 744 (1990); *King Instrument Corp. v. Otari Corp.,* 767 F.2d 853, 863 (Fed.Cir.1985). Where, as here, there are more than two suppliers of the subject product in the market, lost profits may be calculated according to the patent owner's market share. *State Industries, Inc. v. Mor–Flo Industries, Inc.,* 883 F.2d 1573 (Fed.Cir.1989).

In reaching the amount of damages to which plaintiff is entitled, the Court considers the following: (1) the number of lost sales; (2) the gross receipts plaintiff would have obtained from the lost sales had there been no infringement; (3) the cost of sales to be deducted from gross receipts; and (4) plaintiff's profit on the lost sales.

■ In the years before defendants' infringement, King controlled 70 percent of the tapeloader market.[10] Defendants are responsible for seventy-seven infringing machines sold either directly into the United States or by their agent, Alex Novotny, between the years 1983 and 1989. 35 U.S.C. §§ 271(a) and (b). Plaintiff argues that, had defendants not infringed, there is a reasonable probability that King would have made 70 percent of defendants' sales, which would amount to fifty-four machines. Defendants assert, however, that the infringing Model 2,002 was a double pancake machine[11] and that because King did not have a successful double pancake model, it would not have made the sales

---

10. "[T]he use of the patent owner's profit margin, unaffected by the infringing sales, is necessary to estimate what the patent owner's lost profits would have been had there never been an infringement." *King,* 767 F.2d at 864.

11. Double pancake machines have two reels of magnetic tape so that when one reel is empty the machine is automatically fed from the second reel of magnetic tape thus avoiding down time for changing reels.

defendants made. Neither argument is wholly convincing.

The King Model 790, during the years of infringement and continuing to date, has been a successful, high speed single pancake tapeloader, principally responsible for King's large share of the market. Had defendants' double pancake machine not been available, the demand for tapeloaders would have been filled by whatever else was on the market. Considering that King controlled 70 percent of the market, King could have made 70 percent of those sales.

Defendants argue that their customers were not in the market for a single pancake loader, and, had the Model 2,002 been unavailable, they would not have bought a single pancake loader. The evidence does not support the finding that all of defendants' customers were upgrading to double pancake machines, and had one not been available, would have been content to stay with their present running capacity. It is possible, however, that *some* of defendants' customers were so upgrading. This Court believes that there is a reasonable probability that five buyers of the Model 2,002 machine were in the market for a double pancake loader only and would not have bought a single pancake loader had a double not been available. *See Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 553, 222 U.S.P.Q. 4 (Fed.Cir. 1984). But this Court still finds that King would have made forty-nine of defendants' sales had they not infringed, and is entitled to its lost profits on those lost sales.

In determining lost profits, courts rely on what has become known as the "incremental income" approach. *Paper Converting Machine Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22, 223 U.S. P.Q. 591 (Fed.Cir.1984). This approach recognizes that once fixed costs have been paid, it does not cost as much to produce additional units. I find that King had the capacity during the period of infringement to produce forty-nine additional tapeloaders without a significant increase in fixed costs, such as management salaries, property taxes and insurance. Thus those costs which do not vary with increases in produc-

tion are excluded when determining profits. *Id.*

The Court's findings as to lost profits are as follows: The price of the King Model 790 that plaintiff would have sold had defendants not infringed was $24,000.00. King's profit margin was approximately 60 percent, or $14,400.00 per King machine. For the forty-nine machines King would have sold, King is entitled to $705,600.00 in lost profits. With regard to spare parts, I find that, on the average, King's profit on spare parts per machine was approximately $3,591.00. King is entitled to $176,000.00 in damages for lost profits on the spare parts it would have sold for the forty-nine machines, had defendants not infringed.

King also asserts that, for the 30 percent of defendants' infringing sales that would have gone to the rest of the tapeloader market, it is entitled to lost profits on those machines as well. King argues that, if the rest of the tapeloader market also infringe its patents, then defendants may not benefit because of the infringement of others. There is no evidence, however, and plaintiff did not assert that any of the tapeloaders representing the rest of the market infringed the '461 Patent. Therefore, the twenty-three Tapematic machines that would have been sold by others in the market were acceptable noninfringing alternatives. King is entitled to a reasonable royalty of five percent of the sales price of twenty-three Tapematic Model 2,002 machines. Whereas the Tapematic 2,002 sold for $22,000.00 per machine, King is entitled to $1,100.00 per machine, or $25,300.00, as a reasonable royalty on twenty-three machines. Furthermore, plaintiff is entitled to prejudgment interest at the rate of 11 percent.

## VII. *Conclusion*

For the reasons discussed above, the Court concludes that defendants infringed the '461 Patent and plaintiff is entitled to the damages caused thereby, interest and costs. The Court also finds no infringe-

ment of the '153 Patent and the '123 Patent.

SO ORDERED.